# FRAUDULENT TRUST.

MURRAY *v.* RIGGS, 15 J. R. 571–592.

In Ch. 2 J. C. 565.

*Fraudulent Trust and Power of Revocation; Fraudulent Reservation.*

THIS was a bill filed by Riggs and others, assignees of Robert Murray, a bankrupt under the United States bankrupt act, by virtue of a separate commission of bankruptcy against him, issued on the 15th of June, 1801, under which his property had been assigned to the plaintiffs on the 2d of July, 1801. The bill was filed in 1802, against J. B. Murray, and J. S. Clark, to whom Robert Murray, for himself, and as attorney (duly authorized) for his partners, G. W. Murray, J. R. Wheaton, and James V. Murray, on the 23d of March, 1798, made an assignment of all their partnership property in the United States, to J. B. Murray, and J. J. Clark. The deed recited that the co-partners had become insolvent; that the assignees had advanced money, &c. This assignment was made expressly *in trust*, to sell, collect, and receive the property, and to apply the proceeds to the payment of the balances due to the trustees, and to *such other creditors* as the assignors should, by deed, within one year thereafter, *name and specify,* and on *such terms and conditions, as they, by such deed, should direct, and in default of such direction, then in trust for the grantors, and further, with power to change the trustees,"* &c.

On the 24th of March, 1798, the grantors by deed, directed the grantees to pay the expenses of the trust and retain for their own use, several sums therein specified; reserving still to themselves the power by deed at any time before the complete adjustment of the trust, within one year, to alter or revoke the appointments.

On the 21st of March, 1799, they by deed revoked the appointments, &c., of the last mentioned deed, and directed the trustees to pay the expenses of the trust, and to pay

themselves and divers other creditors specified, at the times and in the proportions expressed in the deed, *again reserving the power to alter and revoke,* &c., as before.

On the 31st of May, 1800; the grantors by virtue of such power, directed the trustees to pay, out of the proceeds in their hands, 1. All expenses incurred. 2. Towards the support of the grantors from the 28th of March, 1798, until they should be respectively discharged from their debts, or until one year after, not exceeding $2,000 a year, for each of them. 3. To pay certain creditors named. 4. To pay themselves certain specified debts. 5. To pay other debts due to the trustees, &c., to indemnify bail, &c. 6. That the assignees should make a final settlement with the creditors last mentioned, on certain terms mentioned, and hold the balance of the proceeds subject to the further order of the grantors; and *that the creditors who should not accept the conditions,* or should knowingly embarrass the objects aforesaid, should be forever excluded from any share under the assignment.

The bill charged that Robert Murray as partner had contracted debts to upward of $700,000 ; that the assignment of 1798 was fraudulent, and made to delay, hinder and defraud creditors; that the private property of Robert Murray, exclusive of his share in the partnership property, was very inconsiderable; and the bill prayed an account from the trustees, and that they be directed to deliver up all books, &c., belonging to the estate or firm, and that they pay to the plaintiffs the balance, &c., and that the same assignments might be declared fraudulent and void.

The partners answered, setting up their discharge under the bankrupt act of the United States. The assignees answered, admitting the several deeds of assignment and appointment, and most of the facts charged, *but denied fraud in any of the transactions.* They stated that the property assigned was greatly deficient in paying the debts covered by the assignments; that James V. Murray, one of the partners, claimed to receive the funds in their hands, and had filed his bill for that purpose. They stated the amount received, and submitted to account, &c.

Clark having died, the plaintiffs, with the assent of all parties concerned, made a settlement with his executors,

agreeing to receive what was due from Clark to the estate, after deducting what was due to him, payments made by him, &c., but providing that the plaintiffs were not to be precluded from litigating the validity of the assignments, so far as respects all objects and purposes, except the estate of Clark ; and it was further agreed that the defendant, J. B. Murray should account, &c., and that if it should be determined that the deeds were valid, as to all or any of the *cestui que trusts*, &c., then the trustee as creditor, and the *cestui que trusts*, to have the benefit of the balance, &c.

The cause as to John B. Murray, the surviving trustee, proceeded to issue and publication, but no proofs were taken on either side. After a reference to a master to state the accounts under the above mentioned stipulations, the report, which was excepted to by the plaintiffs, on the ground that it did not show, nor did the evidence, &c., that Murray or M. and M., were entitled to be paid out of the property assigned, &c.

The cause was heard on bill and answer.

The Chancellor. "The material question in the case is, whether the deed of assignment of the 23d of March, 1798, was not, in judgment of law, fraudulent, as against the creditors at large. That was the only deed that assigned the partnership property ; the subsequent deeds between the same parties, including the one of the 31st of May, 1800, were merely directions to the trustees upon that original deed of assignment. If that deed was void, the succeeding deeds must share its fate, as they were incidental to and dependent upon it. They were all connected parts of one transaction.

"There is no further express reservation in the last deed of a power of revocation. The grantors seem at last to have grown weary of sporting with the property as their own. It may be doubted however, whether the power of revocation in the prior deed, was not still in force."

"This leads us to the consideration of the important question arising out of this case, whether such an assignment by an insolvent debtor to a few select creditors, with such a power of revocation, can be deemed valid in law. The necessary inference seems to be that it was made "to delay, hinder, or defraud creditors." The only effect of such an

assignment is to mask the property. If tolerated, it would lead to all imaginable abuses. The law is so jealous on this subject, that if the deed contains a power in any way equivalent in its effects to a power of revocation, it is fatal." p. 579–80.

The Chancellor accordingly declared the assignments fraudulent and void as against creditors; and the trustees were decreed to account for the proceeds of the property received by them under the assignment with interest, deducting their commissions and charges; and to be entitled only to come in, *pari passu*, with the other creditors, for their rateable proportion of the debtor's estate.

From this decree the assignee M. appealed to the Court of Errors, where after argument, the opinion of the court was delivered by Thompson, Ch. J. " The material question in this case grows out of the deed of the 23d of March, 1798, taken in connexion with the subsequent deeds between the same parties. It has been broadly asserted in argument, that the appellant was chargeable with *fraud in fact*. The charge it is true is made in the bill; but it is met and utterly repelled and denied by the answer, and there is not a particle of proof to make out the charge. If the transaction is to be stamped with the character of fraud, it must arise intrinsically from the deeds themselves. It then becomes a question of *fraud in law*. The only circumstance relied upon in support of the allegation of fraud is, that in some of the deeds the grantors have reserved a power to revoke and alter the trusts. This objection does not apply to the deed of the 31st of May, 1800 ; that is absolute and irrevocable. This, in connexion with the first deed of 23d March, 1798, would in my judgment, be amply sufficient to protect and establish the appellant's preference thereby gained. If the controversy was between John B. Murray and some person deriving title from Robert Murray and Co., prior to the 31st of May, 1800, and whilst the property was held under the revocable deeds, a very different question might be presented, but that is not the case here. The assignees of the bankrupt R. M., can take nothing but what the bankrupt himself could assign to them. 1 Atk. 191."

" All these *intermediate* deeds, if they are taken into con-

sideration as forming a part of the transaction, were not, as *between the parties to them,* absolutely void and incapable of confirmation. A deed founded in *actual* and positive fraud, as being made under the influence of a corrupt motive and with the intent to cheat creditors, may be considered void, *ab initio,* and never to have had any lawful existence. The grantee in the deed may be considered as *particeps criminis,* and is not permitted to deduce any right from an act founded in actual fraud. But this rule is not applied to contracts which are only considered fraudulent by construction of law, as being against the policy or provision of some particular statutes. Where the creditor is pursuing his debtor with a judgment and execution, or in any other manner to enforce payment of his demand, an assignment of the debtor's property, containing *a power of revocation,* may very well be considered as made to " delay, hinder, or defraud creditors," according to the language of the statute of frauds. But I do not see how it could, in any sense, be said to delay or hinder a creditor, who was taking no measures to enforce payment of his demand, as is the case now before us. This is an important feature, in which this case is distinguishable from the case of *Clark* v. *Hyslop,* 14 J. R. 458, decided in the Supreme Court, and on which so much reliance has been placed. Clark there was a judgment creditor, and had issued an execution against his debtor, which was levied on the property assigned to Hyslop. This levy was made at a time too, when by the very terms of the assignment, the property was not held under it; that is, after some of the creditors had refused to come in and accept of the terms proposed, and before any new trusts were declared, pursuant to the provisions in the assignment. It was with great propriety there said, that looking up property in this manner was delaying and hindering creditors." In p. 589, Chief Justice Thompson says : " The grantors having reserved to their own use for their maintenance and support a part of the property covered by this deed, forms no objection to the appropriation of the residue ; though in case of a deficiency, to satisfy the creditors, they might apply to a court of equity for the appropriation of the property so reserved, towards the payment of their demands."

"The power reserved to the grantors to revoke and alter the trusts, forms the sole ground of exception. The respondents come here as assignees of Robert Murray, under a title derived from him, after his assignment to John B. Murray, was confirmed and made *irrevocable*. In my opinion, therefore, the decree which declares these deeds null and void ought to be reversed."

A majority of the court concurring with the Chief Justice, the decree of the Chancellor was *wholly reversed*, on the ground that the assignment of the 31st of May, 1800, was legal and valid.

---

☞ The foregoing case would appear to have been questioned from the outset, both as to the *validity* of the reservation for the benefit of the grantor in the deed of the 31st of May, 1800, and as to the *effect* of it upon the validity of the deed itself. In the case of *Austin* v. *Bell*, 20 J. R. 442, it came under the review of the Supreme Court, after Chief Justice Thompson had left the bench of that court. In that case there was a similar reservation, among others, for the benefit of one of the grantors, "*for the maintenance and support of himself and his family, until the first day of May*, 1820, *not exceeding the rate of* $2,000 *per annum*.

Spencer, Chief Justice, in delivering the opinion of the court, says:

"The grounds on which the assignment is supposed to be legally fraudulent are, that it contains stipulations, reserving such sums as are necessary to defray the expenses of defending suits at law or equity against the assignors, in relation to the trust created ; and for services in obtaining or endeavoring to obtain the discharge of the assignors from all their debts ; and also such sums of money as the trustees may be obliged to pay to E. S. (one of the assignors) for the support of himself and family, &c. ; and also, because with respect to creditors who should neglect or refuse to execute the deed, their proportion should be paid to the grantors.

"The case of *Murray* v. *Riggs*, decided in the Court of Errors, (15 J. R. 571,) bears upon some of the objections made to this assignment. It appears that a majority of the court concurred in the opinion of Chief Justice Thompson ;

and that the decree of the Court of Chancery was reversed on the ground that the assignment of the 31st of May, 1800, was legal and valid. *We are bound by that decision, whatever our private opinions may be as to its accuracy or solidity.* As to the reservation in that case, the Chancellor was of opinion on the strength of *Estwick* v. *Caillaud*, 5 T. R. 420, that it did not destroy the provision as to the residue ; and he intimates an opinion that if the part not reserved was deficient, the creditors might apply to a court of equity for the residue. In this part of the Chancellor's opinion, Chief Justice Thompson concurred. This then puts an end to the objection made to this assignment, as to a reservation of a support for a limited time for one of the assignors; and it is equally decisive of the other objections as to defraying the expenses of suits, and of endeavoring to procure their discharge ; for they fall within the same reason."

"The only remaining question is, whether the stipulation reserving to the assignors the proportions of such of the creditors as neglected or refused to execute the assignment, renders it fraudulent and void."

He then proceeds to show that the court had already in effect decided this point in the case of *Hyslop* v. *Clark*, 14 J. R. 458. "That case," he says: "was decided in October term, 1817, and the case of *Murray* v. *Riggs*, in February, 1818. Chief Justice Thompson assented to the decision in *Hyslop* v. *Clark*, and it can not be admitted that he intended to overrule that case by anything he said in the case of *Murray* v. *Riggs*. The contrary, in truth, appears, from his distinguishing between the two cases, as has already been mentioned. Mr. Justice Van Ness, who delivered the opinion of the court, said "that it was also one object to coerce the creditors to acquiesce in the terms offered them, and that therefore that part of the assignment was void under the statute of frauds; and that being void *in port us against the provisions of a statute*, it was *in toto ;* and in this opinion the court unanimously concurred. Now, I can not perceive any material distinction between the case of *Hyslop* v. *Clark*, and the one before us, unless, indeed, it be that this is a stronger case of legal fraud." And the *whole deed* was accordingly declared to be fraudulent and void.

Although the case of *Murray* v. *Riggs*, was thus professedly acquiesced in, it is easy to see, that practically, " its accuracy and solidity," as Chief Justice Spencer expressed it, were denied, and its authority by one distinction or other always evaded. It would have been better to have denied it to be law at once, than to go on professedly recognizing it as a binding precedent, and yet always contriving to circumvent the principle of the decision; holding it to be binding as to one point, and then wholly disregarding it as to *another ;* as Chief Justice Spencer's opinion does with regard to *fraud in law ;* or, as Chancellor Sandford did in the case to which we shall presently come, holding it to be a case, *sui generis,* and "*decided upon its own peculiar circumstances,*" but yet " *an authority for any case like itself.*" The case to which we allude was the following one, in which it will be found that the case of *Murray* v. *Riggs*, as to every point bearing upon the effect of such a reservation upon the validity of the *whole deed,* as well as the validity of the reservation itself, was finally placed in the *Index Expurgatorius* of our state jurisprudence.

